**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
~~GREENVILLE~~ **DIVISION**
*Spartanburg*

RECEIVED
USDC CLERK, GREENVILLE, SC

2005 AUG 25  A 11: 24

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| LEONARD M. SNYDER, H. DANE REYNOLDS, C. BURT DUREN and R. CAREY JOHNSON, | : |
| | : |
| Defendants. | : |

7 - 0 5 - 2 4 7 1 - R B H

### Complaint For Injunctive And Other Relief

The Securities and Exchange Commission ("Commission") files this Complaint for Injunctive and Other Relief and alleges as follows:

### Summary

1.  This case involves false statements that One Price Clothing Stores, Inc. ("One Price") made in the public reports it filed with the Commission during 2003. One Price, although now bankrupt, was a national clothing retailer formerly headquartered in Duncan, South Carolina.

2.  During 2002 and 2003, One Price was experiencing declining sales and relied heavily on a credit facility with its primary lender to provide cash for its on-going operations. The level of One Price's inventory, which collateralized the company's debt, determined the maximum amount that One Price could borrow under the credit facility.

3.  In order to increase One Price's allowable borrowings and avoid default under the credit facility, One Price's Chief Executive Officer, Leonard M. Snyder

("Snyder"), along with the company's Chief Financial Officer, H. Dane Reynolds ("Reynolds"), Treasurer (and successor Chief Financial Officer), C. Burt Duren ("Duren"), and Controller, R. Carey Johnson ("Johnson"), caused One Price to falsely report as inventory merchandise that was ordered but never shipped to the company. This false reporting of in-transit inventory was a default under the terms of One Price's credit facility.

4.    Based on the artificially inflated inventory levels that One Price reported to its lender, One Price misrepresented that it was in continual compliance with the credit facility in its Form 10-K filed with the Commission for the fiscal year ended February 1, 2003, and in Forms 10-Q for the quarters ended May 3, August 2, and November 1, 2003. In fact, One Price was in default under the terms of the credit facility during each of those periods.

5.    Additionally, One Price included the falsely inflated levels of inventory in its general ledger and thus reported false and inflated levels of inventory in the interim financial statements One Price filed with the Commission in its Forms 10-Q for the quarters ended May 3, August 2, and November 1, 2003.

6.    Defendants Snyder, Reynolds, and Duren have engaged in, and unless restrained and enjoined by this Court, will continue to engage in, acts and practices which constitute and will constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13a-14, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, and 240.13b2-2], and acts and practices that aid and abet violations of

2

Sections 13(a), 13(b)(2)(A), and 13(b)(2)B) of the Exchange Act [15 U.S.C. §§ 78m(a),

78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17

C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

      7.    Defendant Johnson has engaged in, and unless restrained and enjoined by

this Court, will continue to engage in, acts and practices which constitute and will

constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15

U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5 and 13b2-1

thereunder [17 C.F.R. §§ 240.10b-5 and 240.13b2-1], and acts and practices that aid and

abet violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15

U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13

thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

### Jurisdiction and Venue

      8.    The Commission brings this action pursuant to Sections 20(b), 20(d) and

20(e) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77t(e)] and Sections 21(d)

and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin the Defendants

from engaging in transactions, acts, practices and courses of business alleged in this

complaint, and transactions, acts, practices, and courses of business of similar purport and

object, for disgorgement of illegally obtained funds and prejudgment interest, other

equitable relief, and for civil money penalties.

      9.    This Court has jurisdiction of this action pursuant to Sections 20(b), 20(d),

20(e) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77t(e) and 77v(a)] and

Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

10.     The Defendants, directly and indirectly, have made use of the mails, the means and instruments of transportation and communication in interstate commerce, and the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

11.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because many of the acts alleged in this complaint occurred within the District of South Carolina.

## Defendants

12.     Leonard M. Snyder, 57, was One Price's President, Chief Executive Officer ("CEO"), and Chairman from January 2001 until September 2003. Snyder presently resides in Arizona.

13.     H. Dane Reynolds, 54, was One Price's Chief Financial Officer ("CFO") from March 1999 until September 2003. Reynolds presently resides in North Carolina.

14.     C. Burt Duren, 46, was One Price's Vice President of Finance and Treasurer until October 2003, when he was appointed as CFO of the company.  Duren was terminated from that position in December 2003. Duren presently resides in Pennsylvania.

15.     R. Carey Johnson, 57, was One Price's Controller from December 1996 until May 2004.   Johnson resides in Lyman, South Carolina.

4

**Related Party**

16.    One Price Clothing Stores, Inc. is a Delaware corporation formerly

headquartered in Duncan, South Carolina. Before filing for bankruptcy in February

2004, One Price operated a chain of discount retail clothing stores. On February 9, 2004,

One Price filed a voluntary Chapter 11 bankruptcy petition in the Southern District of

New York. Operating as a debtor-in-possession, One Price sold substantially all of its

tangible assets and terminated all but a handful of employees used to assist in the

bankruptcy process. On March 23, 2005, upon the motion of the bankruptcy trustee, the

case was converted into a Chapter 7 proceeding.

**The Scheme to Inflate Inventory Levels**

**Key Provisions and Operation of One Price's Credit Facility with
Congress Financial**

17.    During 2002 and 2003, One Price operated under a revolving credit

facility that it had previously entered into with its primary lender. One Price's inventory

collateralized its borrowings under the credit facility. The credit facility required One

Price to report its inventory levels to its lender on a weekly basis. Under the terms of the

credit facility, One Price could only report inventory in its possession or that had actually

been shipped to the company from its vendors. The credit facility defined inventory to

include 'in-transit inventory' which were orders that had been shipped but had not yet

been received by the company.

18.    The maximum amount that One Price was allowed to borrow under the

credit facility fluctuated based upon the inventory levels One Price reported to its lender.

Under the credit facility's borrowing formula, the liquidation value of One Price's

5

inventory plus the value of certain other assets had to exceed the company's outstanding borrowings by a specific amount, the minimum level of "excess availability."

19.    By failing to comply with the provisions and covenants of the credit facility, including the minimum excess availability levels, One Price would be in default, thereby triggering immediate repayment obligations. Moreover, any misrepresentations in the weekly reports to its lender would constitute a default under the credit facility.

### One Price's Inventory Control Process

20.    One Price's finance division, headed by the CFO, controlled the inventory process at One Price. During the relevant period, Reynolds served as CFO until September 2003, after which Duren was promoted to that position. The Treasurer, Duren (until October 2003), and the Controller, Johnson, each reported directly to the CFO.

21.    Duren, as Treasurer, was responsible for, among other things, overseeing compliance with the credit facility and preparation of Commission filings.

22.    Johnson, as Controller, was responsible for the inventory control, general accounting, distribution and traffic, and accounts payable departments. To the extent that those departments were involved in the function of credit facility compliance, Johnson reported directly to Duren.

23.    The inventory process was designed to work as follows: First, One Price's finance division authorized the company's buyers to issue an amount of purchase orders that was determined on a weekly basis. The buyers then issued purchase orders to specific vendors. Once a vendor was ready to ship the underlying merchandise, the vendor "called in" the order by contacting an employee in the finance division.

24.     After a vendor called in an order, an employee in the finance division issued a control number for the order and entered the order as in-transit inventory in the inventory-control database, which also contained information about One Price's entire inventory. This process was based upon the assumption that vendors would ship their orders within a few days after they called them into One Price.

25.     One Price generated the weekly reports that it was required to send to its lender under the credit facility from the inventory-control database.

26.     At the end of each month, employees in the accounts payable department entered the in-transit inventory level from the inventory-control database into an "accrual" account in the general ledger, thereby updating whatever level of in-transit inventory had been entered at the end of the previous month.

### Artificial Inflation of Inventory Levels

27.     From late 2002 until December 2003, Snyder, Reynolds, Duren and Johnson devised and executed a plan to increase One Price's borrowing capacity under the credit facility by falsely overstating the value of the inventory reported weekly to One Price's lender.

28.     Each week, Snyder, Reynolds, Duren and Johnson met and collectively determined how much inventory was needed to maintain compliance with the credit facility and provide for One Price's on-going cash needs. Snyder, Reynolds, Duren and Johnson knew, when they directed the finance division to approve purchase orders, that they were ordering substantially more inventory than One Price would ultimately pay for and receive.

7

29.     After their meeting, Snyder, Reynolds, Duren and Johnson directed employees in the finance division to approve purchase orders to vendors for the additional inventory necessary that week.

30.     Johnson communicated this information to buyers in the merchandising division, who then sent purchase orders to vendors that were purportedly ready to ship the amount of additional inventory that Snyder, Reynolds, Duren and Johnson had determined.

31.     After receiving the purchase orders, the vendors then 'called in' their orders to One Price's finance division. Consequently, inventory control numbers were assigned to the orders and they were entered as in-transit inventory in the inventory control database.

32.     Although the inventory orders were entered in One Price's inventory control database (and reported to the lender weekly as in-transit inventory), Snyder, Reynolds, Duren and Johnson knew that more inventory was being ordered than would ultimately be paid for, and that the underlying merchandise would not be shipped until One Price actually paid for it, which often took months, and in many instances never even occurred.

33.     Based in part on the number of call-ins that One Price received each week from its vendors, Snyder, Reynolds, Duren and Johnson also met each week to determine how much cash was available to pay the company's expenses, including  the purchase orders that made up the in-transit inventory.

34.     After determining how much cash was available to pay expenses, the defendants, senior-level buyers and other finance division employees met to determine

how the available cash should be allocated. At these meetings, the buyers identified which previously ordered, unshipped merchandise the company actually needed. The finance division then sent payments to the appropriate vendors.

35.    As a result, One Price only paid for a portion of the in-transit inventory which was included in the inventory control database and, later, reported to the general ledger.

36.    Snyder and Reynolds routinely directed One Price employees to cancel aging, unshipped orders included in the in-transit inventory. This was accomplished by removing 'called-in' purchase orders from the inventory control database. Snyder and Reynolds knew, or were severely reckless in not knowing, that new, unshipped orders were immediately created to replace the older orders that were cancelled.

37.    Accordingly, the magnitude of the overstatement of in-transit inventory in One Price's inventory control database (reconciled to the general ledger on a monthly basis) continued to grow throughout the period from late 2002 through 2003.

### Effects of One Price's Inventory Overstatement on the Company's Commission Filings

38.    Given the actual inventory actually received and the borrowing formula, One Price was in default under the terms of the credit facility throughout the period from late 2002 through December 2003.

39.    In its Form 10-K for fiscal year 2003 and Forms 10-Q for the quarters ended May 3, August 2, and November 1, 2003, One Price described the company's precarious financial condition and the importance of the credit facility to its ongoing operations and falsely represented that the company was in continual compliance with the terms of its credit facility.

9

40.    Since the inflated in-transit inventory amounts were also added to the general ledger, the consolidated balance sheets included in One Price's Forms 10-Q for the quarters ended May 3, August 2, and November 1, 2003, contained asset entries for "merchandise inventories" that were inflated by the amounts identified in the following table:

| BALANCE SHEET | INVENTORY OVERSTATEMENT | % OF REPORTED INVENTORY |
|---|---|---|
| Form 10-Q for first quarter of ended May 3, 2003 | $2.1 million | 4% |
| Form 10-Q for the quarter ended August 2, 2003 | $7.6 million | 14% |
| Form 10-Q for the quarter ended November 1, 2003 | $8.2 million | 14% |

### The Defendants' Participation in the Preparation and Review of One Price's Commission Filings

41.    Snyder, Reynolds, Duren and Johnson knew, or were severely reckless in not knowing, that the inflated in-transit inventory levels from the general ledger were used to create the financial statements included in the company's Commission filings and served as the basis for the materially false statements in those filings concerning credit facility compliance.

42.    At Reynolds's request, Johnson generated, and routinely distributed to Snyder, Reynolds and Duren, a spreadsheet that identified which orders had been 'called in' and assigned inventory control numbers, but had not yet been shipped. These reports each showed that a substantial percentage of the orders making up in-transit inventory had not been shipped. Nonetheless, they knowingly, or with severe recklessness, continued to order more inventory than would ultimately be paid for and shipped.

43.    Snyder, Reynolds, Duren, and Johnson each participated in the preparation and internal review of One Price's Commission filings. Duren directly supervised the drafting of One Price's Commission filings. Johnson supervised the preparation of the financial statements included in those filings.   Snyder and Reynolds reviewed and approved the filings.

44.    Snyder, Reynolds, Duren, and Johnson participated in Audit Committee meetings where One Price's financial statements were reviewed and approved before they were included in the company's public filings.

45.    Snyder, Reynolds, and Duren signed the certifications required by Commission Rule 13a-14 [17 C.F.R. § 240.13a-14] for those reports. Specifically, Snyder signed the principal executive certification for the Form 10-K for fiscal year 2003 and for the Forms 10-Q for the quarters ended May 3, 2003 and August 2, 2003. Reynolds signed the principal financial officer certification for those same reports. Duren signed the principal financial officer certification for One Price's Form 10-Q for the quarter ended November 1, 2003.

46.    Synder, Reynolds and Duren each knew, or were severely reckless in not knowing, that the certifications that they signed contained material misrepresentations concerning the amount of One Price's inventory and misrepresented its compliance with its credit facility.

## The Defendants' Concealment of Inventory Overstatements

47.    Snyder, Reynolds, Duren and Johnson concealed the inflation of One Price's inventory levels from its lender and the company's outside auditors.

48.     Snyder, Reynolds, Duren and Johnson participated in Audit Committee meetings with representatives of the company's outside audit firm in connection with the preparation of One Price's public filings,.

49.     At each of these meetings, Reynolds or Duren presented an overview of the company's financial results and operations for the then-current filing period. The engagement partner for the outside audit firm discussed its review of One Price's financial statements, which at all relevant times included an analysis that One Price was in compliance with its credit facility.

50.     Nonetheless, Snyder, Reynolds, Duren and Johnson failed to disclose to the auditors or members of the audit committee that One Price was inflating its inventory levels in weekly reports to its lender and including those inflated amounts on its general ledger.

51.     Snyder, Reynolds, Duren and Johnson knew that creating false levels of inventory and, hence, avoiding default under One Price's credit facility prolonged One Price's ability to function as an operating business which allowed them to continue to collect their salaries.

### Private Investment Transactions

52.     In June 2003, a private investment firm purchased approximately $8 million of One Price's stock in a negotiated transaction with the company, thereby obtaining approximately 85% of One Price's voting securities.

53.     Later, in October 2003, the private investment firm loaned One Price an additional $5 million dollars.

12

54.     Snyder, Reynolds, Duren and Johnson participated in the negotiation and consummation of both transactions with the private investment firm.

55.     Snyder, Reynolds, Duren and Johnson knew, or were severely reckless in not knowing, that the company's current public filings and the copies of the reports to its lender concerning the credit facility that were provided to the private investment firm contained false in-transit inventory levels.

## Claims for Relief

### Count I - Fraud
### Violations of Section 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]

56.     Paragraphs 1 through 55 are hereby realleged and incorporated herein by reference.

57.     Defendants Snyder and Reynolds, from late 2002 through September 2003, and Defendants Duren and Johnson, from late 2002 through December 2003, in connection with the offer or sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails, directly and indirectly,

a) employed devices, schemes and artifices to defraud purchasers of such securities;

b) obtained money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, not misleading; and

c) engaged in transactions, practices and a course of business which operated as a fraud or deceit upon the purchasers of such securities, all as more particularly described in the paragraphs above.

58.    Defendants Snyder, Reynolds, Duren, and Johnson knowingly, intentionally and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.  In engaging in such devices, schemes and artifices to defraud, Snyder, Reynolds, Duren, and Johnson acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

59.    By reason of the foregoing, Defendants Snyder, Reynolds, Duren, and Johnson, directly and indirectly, have violated and unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## Count II - Fraud
### Violations of Section 10(b) of the Exchange Act [15. U.S.C.§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

60.    Paragraphs 1 through 55 are hereby realleged and are incorporated herein by reference.

61.    Defendants Snyder and Reynolds, from late 2002 through September 2003, and Defendants Duren and Johnson, from late 2002 through December 2003, in connection with the purchase or sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

a) employed devices, schemes, and artifices to defraud;

b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c) engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described in the paragraphs above.

62.    Defendants Snyder, Reynolds, Duren, and Johnson knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Defendants Snyder, Reynolds, Duren, and Johnson acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

63.    By reason of the foregoing, Defendants Snyder, Reynolds, Duren, and Johnson, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**Count III-Aiding and Abetting Violations of Reporting Provisions**

**Aiding and Abetting One Price's Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12-20, 240.13a-1, and 240.13a-13]**

64.    Paragraphs 1 through 55 are hereby realleged and are incorporated herein by reference.

15

65.    Defendants Snyder and Reynolds, from late 2002 through September 2003, and Defendants Duren and Johnson, from late 2002 through December 2003, aided and abetted One Price's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder, which occurred when One Price filed periodic reports that contained: (1) material misstatements concerning the company's credit facility compliance and (2) financial statements that were not prepared in conformity with GAAP. Through the conduct described in the above paragraphs, Snyder, Reynolds, Duren, and Johnson knowingly or recklessly substantially assisted One Price's violations of this section and rules.

66.    By reason of the foregoing, Defendants Snyder, Reynolds, Duren, and Johnson have aided and abetted violations, and, unless enjoined, will continue to aid and abet violations of, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-1

### Count IV- Aiding and Abetting Books and Records and Internal Controls Violations

### Aiding and Abetting One Price's Violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)]

67.    Paragraphs 1 through 55 are hereby realleged and are incorporated herein by reference.

68.    Defendants Snyder and Reynolds, from late 2002 through September 2003, and Defendants Duren and Johnson, from late 2002 through December 2003, aided and abetted One Price's violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. 78m(b)(2)(A)], which occurred when One Price failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions

16

and dispositions of One Price's assets. Through the conduct described in the above paragraphs, Snyder, Reynolds, Duren, and Johnson knowingly or recklessly substantially assisted Professional Transportation's violations of these sections.

69. Defendants Snyder and Reynolds, from late 2002 through September 2003, and Defendants Duren and Johnson, from late 2002 through December 2003, aided and abetted One Price's violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. 78m(b)(2)(B)], which occurred when One Price failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization;  (ii) transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets; (iii) access to assets was permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

70. By reason of the foregoing, Defendants Snyder, Reynolds, Duren, and Johnson have aided and abetted violations, and, unless enjoined, will continue to aid and abet violations of, Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B)].

### Count V - Books and Records and Internal Controls Violations

### Violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. §§78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder

71.    Paragraphs 1 through 55 are hereby realleged and are incorporated herein by reference.

72.    Section 13(b)(5) of the Exchange Act prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account required by Section 13(b)(2)(A) of the Exchange Act. Rule 13b2-1 prohibits any person from directly or indirectly falsifying or causing the falsification of any such books, records or accounts.

73.    Through the conduct described above, Defendants Snyder, Reynolds, Duren and Johnson, directly and indirectly, have violated and, unless enjoined, will continue to violate 13(b)(5) of the Exchange Act [15 U.S.C. §§78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder.

### Count VI - False Statements to Auditors

### Violations of Rule 13b2-2 [17 C.F.R. § 240.13b2-2]

74.    Paragraphs 1 through 55 are hereby realleged and are incorporated herein by reference.

75.    Defendants Snyder and Reynolds, from late 2002 through September 2003, and Defendant Duren, late 2002 through December 2003, made or caused to be made material false or misleading statements, or omitted or caused another to omit a material fact necessary to make a statement not misleading to an accountant in

connection with an audit or examination of financial statements or a document or report required to be filed with the Commission.

76.    By reason of the foregoing, Defendants Snyder, Reynolds, and Duren, directly and indirectly, have violated and, unless enjoined, will continue to violate Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

### Count VII – Signing False Certifications

### Violations of Rule 13a-14 [17 C.F.R. § 240.13a-14]

77.    Paragraphs 1 through 54 are hereby realleged and are incorporated herein by reference.

78.    Defendants Snyder, Reynolds, and Duren knowingly signed certifications which were included in reports that One Price filed with the Commission pursuant to Section 13(a) of the Exchange Act [15 U.S.C. §§78m(a)] which contained untrue statements of material fact,

79.    By reason of the foregoing, Snyder, Reynolds, and Duren violated Rule 13a-14 [17 C.F.R. § 240.13a-14].

### **Prayer for Relief**

WHEREFORE, Plaintiff Commission respectfully prays that the Court:

### I.

Make findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

### II.

Issue a permanent injunction enjoining Defendants Snyder, Reynolds, and Duren, and their agents, servants, employees, attorneys, and all persons in active concert or

19

participation with them who receive actual notice of the order by personal service or otherwise, and each of them:

(a) from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

(b) from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(c) from violating Rule 13a-14 [17 C.F.R. § 240.13a-14];

(d) from violating Section 13(b)(5) of the Exchange Act [15 U.S.C. 78m(b)(5)] and Rules 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2];

(e) from aiding and abetting violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13]; and

(f) from aiding and abetting violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§78m(b)(2)(A) and 78m(b)(2)(B)].

### III.

Issue a permanent injunction enjoining Defendant Johnson and his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, and each of them:

(a) from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

(b) from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(c) from violating Section 13(b)(5) of the Exchange Act [15 U.S.C. 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2];

(d) from aiding and abetting violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13]; and

(e) from aiding and abetting violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§78m(b)(2)(A) and 78m(b)(2)(B)].

IV.

Issue an Order requiring Defendants Snyder, Reynolds, Duren, and Johnson to disgorge any ill-gotten gains and losses avoided as a result of the conduct alleged in the Commission's Complaint, plus pay prejudgment interest thereon.

V.

Issue an Order requiring Snyder, Reynolds, Duren, and Johnson, pursuant to Section 20(d) of the Securities Act [15 U.S.C. 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. 78u(d)(3) and 78u-1], to pay civil monetary penalties.

VI.

Issue an Order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)] permanently prohibiting Defendants Snyder, Reynolds, Duren, and Johnson from acting as an officer or director of any issuer that has a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act [15 U.S.C.§ 78o(d)].

## VII.

Issue an Order that retains jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may have been entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as may be necessary and appropriate.

Dated:  August 25, 2005

RESPECTFULLY SUBMITTED,

Alex Rue
Senior Trial Counsel
Ga. Bar No. 618950

Counsel for Plaintiff
Securities and Exchange Commission
3475 Lenox Road, N.E., Suite 1000
Atlanta, Georgia 30326-1234
Rue: (404) 842-7616          Email ruea@sec.gov
Fax. (404) 842-7666

JONATHAN S. GASSER
UNITED STATES ATTORNEY

BY: _____
George J. Conits (#234)
Assistant U.S. Attorney
105 N. Spring St. Suite 200
Greenville, SC 29601
(864) 282-2116 (voice)
(864) 233-3158 (fax)
email:  george.conits@usdoj.gov